UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| DUNKIN' DONUTS LLC, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 06-C-2213 |
| | ) | |
| JAMES PIELET, *et al.* | ) | Judge Leinenweber |
| | ) | |
| Defendants. | ) | Magistrate Judge Keys |
| | ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs hereby move for a preliminary injunction enjoining Defendants from continuing to misuse the Dunkin' Donuts, Baskin-Robbins, and Togo's Eateries proprietary marks – without a license or authorization – following the termination of Defendants' six Franchise Agreements for their failure to pay certain contractually required fees and trademark royalties since January 2005 (totaling more than $200,000). Plaintiffs also seek enforcement of certain real estate property rights, pursuant to various lease, lease option, and lease rider provisions, which require Defendants to turn over physical possession of the premises associated with their franchises to Plaintiffs in the event that the Franchise Agreements are terminated for any reason.

Plaintiffs terminated the Franchise Agreements because Defendants refused to pay any of their past-due accrued franchise fees and advertising fund fees since the beginning of 2005 – despite receiving written notice of default and an opportunity to cure their financial defaults, pursuant to the terms of the Franchise Agreements. In the Termination Notices, Plaintiffs expressly demanded that Defendants immediately comply with their post-termination obligations under their contracts, including ceasing to utilize Plaintiffs' trademarks, trade name, and trade dress and surrendering possession of the leased premises, pursuant to certain lease provisions. To date, however, Defendants have failed to surrender any of the premises to Plaintiffs or to properly deidentify any of their six terminated shops. Instead, Defendants continue to utilize Plaintiffs' proprietary marks, without a trademark license, as "holdover franchisees."

Over the course of the last few weeks, Defendants have engaged in a half-hearted attempt to deidentify some of the shops by removing only some (but not all) of the Dunkin' Donuts logos, trademarks, and trade names from the premises. For instance, on the signage for some of the shops, they took down the word "Dunkin'," but still display the word "Donuts" in the distinctive pink frankfurter lettering style font and trade dress used by authorized Dunkin' franchisees. The shop employees now claim that the name of the business is simply "Donuts." In addition, they "painted out" or taped over the word "Dunkin'" from their signage, and scraped the word "Dunkin'" off of their coffee pots. Nonetheless, they continue to sell Dunkin' brand coffee, doughnuts, muffins, and other products and to display the Dunkin' name on cash register receipts, cups, straws, napkins, sandwich wraps, wallpaper, and menu boards. The fact that Defendants have only partially deidentified the shops and have done so in a particularly haphazard and sloppy manner only *increases* the irreparable harm to Dunkin'. Not only are customers now more likely to be confused as to whether the locations are authorized Dunkin' shops, but they may gain the misimpression that that the Dunkin' system is having operational problems. Thus, the state of the franchisees' shops has had the effect of diluting the Dunkin' Donuts trademarks and is causing irreparable injury to the proprietary marks and brand image in the eyes of consumers.

The current situation is causing irreparable harm to all three brands and franchise systems because Plaintiffs have lost control over the use of their own trademarks. In fact, Defendants are effectively *stealing* Plaintiffs' proprietary marks – exploiting the trademarks, trade name, and trade dress of Dunkin' Donuts, Baskin-Robbins, and Togo's Eateries – to line their own pockets with an unjust windfall. Defendants refuse to cease using the trademarks, are continuing to breach the Franchise Agreements, and are holding themselves out to the public as authorized franchisees, even though they have no trademark license.

Accordingly, an injunction enjoining Defendants' continued unauthorized use of Plaintiffs' trademarks, trade name, and trade dress and their unfair competition in violation of the Lanham Act is warranted.

## STATEMENT OF FACTS

1.      Plaintiffs expressly incorporate by reference the provisions of the Complaint, and the Certifications attached hereto, as if set forth fully herein.

**The Parties' Rights and Obligations Under the Franchise Agreements**

2.      Plaintiffs are the franchisors of the Dunkin' Donuts, Baskin-Robbins, and Togo's franchise systems and the owners of their respective trademarks, which are distinctive and of inestimable value.  Exhibit 1, Certification of Jack Laudermilk, at ¶¶ 25-58.

3.      All of the Corporate Franchisee Defendants were licensed to use Dunkin's trademarks, trade name, and trade dress, subject to the terms of their Franchise Agreements. *Id*. ¶ 18-21.  As noted above, certain Defendants were also concurrently licensed to use the Baskin-Robbins and/or Togo's trademarks and trade names in accordance with the terms of their Franchise Agreements.  *Id.*

4.      Under the terms of the Franchise Agreements, Defendants agreed to pay Plaintiffs 4.9% of the retail gross sales of their Shops as a "Continuing Franchise Fee" and another 5.0% of their gross sales as a "Continuing Advertising Fee."  *See* Exs. 1C-H, Franchise Agreements, ¶¶ 4.3, 4.4, 4.E, 4.F, Contract Data Schedules, ¶¶ E, F.  Defendants also agreed to keep full, complete, and accurate books and accounts in accordance with generally accepted accounting principles and in a form and manner as may be prescribed by Plaintiffs.  *See id.* ¶¶ 5.2, 5.H. Moreover, Defendants agreed not to perform, directly or indirectly, any act injurious or prejudicial to the goodwill associated with Plaintiffs' proprietary marks and systems.  *See id.* ¶¶ 8.0.1, 8.A.1.

5.      Additionally, Defendants signed certain acknowledgments and agreements concerning their continued use of Plaintiffs' proprietary marks, or any methods associated with the names "Dunkin' Donuts," "Baskin-Robbins," or "Togo's," after the termination of the Franchise Agreements.  Defendants agreed that any unauthorized or continued use of the marks after termination constitutes irreparable harm subject to injunctive relief.  *See id.* ¶¶ 7.1, 7.A. Defendants expressly agreed that, upon termination, they would comply with all post-termination obligations, including immediately ceasing to use the Plaintiffs' trademarks and any methods associated with the Dunkin' Donuts, Baskin-Robbins, and Togo's Systems.  *See id.* ¶¶ 9.4.3, 9.F.2.

**The Cross-Guarantee Provisions**

6.      Pursuant to the Cross-Guarantees contained in Paragraph 5.6 of the Franchise Agreements, each corporate franchisee, and each partner, member, or shareholder thereof, is jointly and severally liable for the defaults of the others under their respective

Franchise Agreements, where one or more of the partners, members, or shareholders holds or ever held an interest in another Dunkin' Donuts, Baskin-Robbins, or Togo's franchise. Consequently, because Defendant James Pielet now holds or has held an interest in all six of the Shops and Franchise Agreements, each of the Corporate Franchisee Defendants and their individual personal guarantors is jointly and severally liable for the defaults of each Defendant with respect to all six of the Shops and all six of the Franchise Agreements. *See id.* ¶ 5.6.

### The Personal Guarantee Provisions

7.     On the signature page of each Franchise Agreement that they signed, Defendants James Pielet, Melissa Pielet, and Bradley Pielet (the "Individual Defendants") each also signed a "Personal Guarantee by Shareholders of a Corporation or Members of a Limited Liability Company" (the "Personal Guarantees") whereby they jointly and severally guaranteed all of the obligations of each Corporate Franchisee Defendant corporation or limited liability company of which they are an officer, member, or shareholder. *See id.*, Personal Guarantee. Under the provisions of the Personal Guarantees, the Individual Defendants each agreed to "hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's other obligations under this Franchise Agreement. . . . We personally agree that the Franchise Agreement shall be binding upon each of us personally." *Id.*

### The Parties' Rights and Obligations Under the Lease, Lease Options, and Lease Rider

8.     Pursuant to the Lease between Plaintiff Third Dunkin' Realty and Defendant Highland Properties LLC, Plaintiff Third Dunkin' Realty has the right to terminate the Lease upon the termination of the Highland Park Franchise Agreement. *See* Ex. 1G, ¶ 15(a). Upon termination of the Lease, Plaintiff Third Dunkin' Realty may physically repossess the premises and "expel the LESSEE." *See id.* ¶ 19(c). Plaintiffs also have similar rights to take possession of the Waukegan Shop, the Northbrook Shop, and the Buffalo Grove Shop, pursuant to certain lease riders and lease option agreements for the premises. *See* Exs. 1H-J.

### Defendants' Defaults and Termination

9.     Defendants have knowingly, purposefully, and repeatedly breached the terms of the Franchise Agreements by, without limitation, refusing to pay, when due, franchise fees, advertising fees, late fees, interest, and attorneys' fees and costs since January 2005. Ex. 1, ¶¶ 59. *See also* Ex. 1K.

4

10.     On July 18, 2005, Plaintiffs sent Defendants JPI and James Pielet a Notice to Cure describing the nature of the defaults under the JPI Franchise Agreements and providing them with seven days to cure those defaults, pursuant to the applicable seven-day cure period specified in the contracts. *See* Ex. 1L. *See also* Ex. 1A-F, ¶¶ 9.1.1, 9.B.2. Instead of sending a check to cure the defaults, Defendants JPI and James Pielet allowed seven days to pass without proffering a cure. Ex. 1, ¶ 62. *See also* Ex. 1K.

11.     Accordingly, on July 28, 2005, Plaintiffs served Defendants JPI and James Pielet with a Notice of Termination, terminating each of the three JPI Franchise Agreements, effective immediately upon receipt of the Notice, stating the grounds for termination, and requesting that Defendants JPI and James Pielet immediately comply with their post-termination obligations, as set forth in the JPI Franchise Agreements. *See* Ex. 1M. Defendants JPI and James Pielet failed to comply with the 2005 Notice of Termination and still continue to operate the Waukegan Shop, the Northbrook Shop, and the Riverwoods Shop today, as if JPI were still a Dunkin' Donuts licensed franchisee, which is not the case. Ex. 1, ¶ 64.

12.     To date, the accrued past-due accounts receivables amount – owed by all of the Corporate Franchisee Defendants as well as the Individual Defendants (as personal guarantors) – approximates $200,000, plus attorneys' fees and costs, and those figures continue to grow on a daily basis because of interest charges. *Id.* ¶ 65. *See also* Ex. 1K.

13.     On March 27, 2006, Plaintiffs sent Defendants J.P. Retail Investments LLC, Highland Properties LLC, and Deerfield Properties LLC a Notice of Default and Notice to Cure describing the nature of the defaults under the JPI Franchise Agreements, citing the cross-guarantee provisions of Paragraph 5.6. The Notice provided the Defendants seven days to cure those financial defaults, pursuant to the applicable seven-day cure period specified in the contracts. *See* Ex. N. *See also* Exs. 1A-F, ¶¶ 5.6, 9.1.1, 9.B.2. Instead of sending a check to cure the defaults, Defendants J.P. Retail Investments LLC, Highland Properties LLC, and Deerfield Properties LLC allowed seven days to pass without proffering a cure. Ex. 1, ¶ 67. *See also* Ex. 1K.

14.     Accordingly, on April 13, 2006, Plaintiffs served Defendants J.P. Retail Investments LLC, Highland Properties LLC, and Deerfield Properties LLC with a Notice of Termination terminating the Non-JPI Franchise Agreements and the Lease, effective immediately upon Defendants' receipt of the Notice, stating the grounds for termination, and

5

requesting that Defendants J.P. Retail Investments LLC, Highland Properties LLC, and Deerfield Properties LLC immediately comply with their post-termination obligations, as set forth in the Franchise Agreements. *See* Ex. 1O. Defendants J.P. Retail Investments LLC, Highland Properties LLC, and Deerfield Properties LLC failed to comply with the 2006 Notice of Termination and still continue to operate the Buffalo Grove Shop, the Highland Park Shop, and the Deerfield Shop, as if they were still licensed franchisees, which they are not. Ex. 1, ¶ 69.

15.   Defendants' willful refusal to cease operating using Plaintiffs' trademarks, trade names, and trade dress as unlicensed "holdover franchisees" constitutes a violation of the Lanham Act as a matter of law and warrants an award of treble damages for trademark infringement, trade dress infringement, and unfair competition. *See* 15 U.S.C. §§ 1114. Defendants' actions have caused and continue to cause irreparable harm to Plaintiffs, including harm to the reputation and goodwill of all three brands. Ex. 1, ¶ 71. Granting the requested permanent injunctive relief would advance the public interest. *Id*.

### The Inadequate Post-Lawsuit Efforts to Partially Deidentify the JPI Shops

16.   After Plaintiffs filed the Complaint in this lawsuit, Defendants JPI and Jim Pielet made certain half-hearted efforts to remove some of the Dunkin' Donuts logos and trade names from the JPI Shops. *See* Ex. 2, Certification of Jason Corriveau, at ¶¶ 3-5. *See also* Exs. 2A-C.

17.   For instance, on the signage for one of the JPI Shops, they took down the word "Dunkin'," but left the word "Donuts" (still in the distinctive pink frankfurter lettering font and trade dress used by authorized Dunkin' Donuts' franchisees). *Id*., ¶ 3(d). The crew members on duty in the JPI Shops now claim that the name of the business is simply "Donuts." *Id*., ¶¶ 3(i), 4(i). In addition, Defendants painted out the word Dunkin' from the inside lighted "Dunkin' Coffee" sign, but the sign was still lit and being used. *Id*. Other signs had the word "Dunkin'" taped over in the window. *Id*. Moreover, they scraped the word "Dunkin'" off of their coffee pots. *Id*., ¶ 4(j). However, the JPI shops continue to serve Dunkin' Donuts brand coffee and Coolatta™ mix, and bags of Dunkin' Donuts brand coffee beans were seen in the shops. *Id*., ¶¶ 3(e), 4(d). Moreover, the doughnuts, muffins, and other products were Dunkin' brand, as were the shelves, menu boards, and shelf tags. *Id*., ¶¶ 3-5. In addition, the JPI shops continue to use the Dunkin' Donuts name on cash register receipts, cups, straws, napkins, sandwich wraps, wallpaper, menu boards, etc. *Id*.

## ARGUMENT

The factors a court is to consider in deciding whether to grant a preliminary injunction are well-established under Seventh Circuit case law. "A preliminary injunction is warranted if the movant can make a threshold showing" that: (1) the case has some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) the movant will suffer irreparable harm if the injunction is not granted; (4) the harm to the movant if the injunction is not granted outweighs the harm to the defendants if it is issued; and (5) the injunction favors the public interest. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 313-14 (7th Cir. 1994). An examination of these factors in this case demonstrates that Dunkin' Donuts is entitled to a preliminary injunction.

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     Plaintiffs Are Likely To Succeed on Their Breach of Contract Claims (Counts I-II) Because Defendants Have Undeniably Failed to Pay Franchise Fees and Have Continued to Use Plaintiffs' Proprietary Marks After the Termination of the Franchise Agreements.

As discussed in the Statement of Facts ("SOF") above, the unambiguous terms of the Franchise Agreements made the Corporate Franchisee Defendants and the Individual Defendants jointly and severally responsible for the payment of franchise fees to Plaintiffs. SOF ¶¶ 4, 6-7. Because none of the Defendants has paid Plaintiffs a penny for their undisputed use of Plaintiffs' trademarks at the JPI Shops since January 2005, despite proper notices and opportunities to cure their financial defaults, Plaintiffs properly terminated all six of the Franchise Agreements and the Lease based on Defendants' breaches of contract. *Id.* ¶¶ 9-15. In addition, the Franchise Agreements and Lease provide that, following termination, Defendants were required immediately to cease using Dunkin's proprietary marks. *Id.* ¶ 5. Because Defendants have failed to fully deidentify their Shops and have refused to turn over possession of the premises to Plaintiffs, they are in further breach of contract on these additional grounds. *Id.* ¶¶ 9-15.

Thus, given the clear, unambiguous terms of the Franchise Agreements and Lease, Plaintiffs are highly likely to succeed on their breach of contract claims in Counts I and II, as well as on their related post-termination Lanham Act claims in Counts III through V, as discussed below.

**B.** **Plaintiffs Are Very Likely To Succeed On Their Trademark Infringement Claim (Count III).**

Because Plaintiffs are likely to succeed on their breach of contract claims, they are similarly likely to succeed on their trademark infringement claim since Defendants no longer have a license to use the trademarks as a result of the termination of the Franchise Agreements. *See, e.g.*, *Ramada Franchise Systems, Inc. v. Boychuk*, No. 1:01-CV-1331, Bus. Fran. Guide ¶ 12,649 (N.D.N.Y. Sept. 17, 2003) (terminated hotel chain franchisee's "continuing to use the Ramada marks and trade dress after the . . . termination letter, violated the Lanham Act").

Under the Seventh Circuit test for trademark infringement, plaintiffs bringing actions under the Lanham Act "must establish that there is a 'likelihood of confusion' between the plaintiff's and the defendant's trademarks. The 'confusing similarity' which results from a violation of trademark law causes a consumer to choose the defendant's product because that consumer believes the defendant's product is 'in some way related to, or connected or affiliated with, or sponsored by the plaintiff.'" *Instrumentalist Co. v. Marine Corps League*, 694 F.2d 145, 152 (7th Cir. 1982) (internal citations omitted). *See also Mobil Oil Corp. v. Auto Brite Car Wash, Inc.*, 615 F. Supp. 628 (D. Mass. 1984) (summary judgment granted because gasoline dealer's unlicensed post-termination use of Mobil signs and distinctive pumps created likelihood of confusion and established defendant's liability under the Lanham Act).

Here, Defendants are using Plaintiffs' exact trademarks and the courts have widely recognized that there is a great likelihood of confusion when an infringer uses the same trademark in such a manner. *See S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (quoting *Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 195 (3d Cir. 1990)); *Lane Capital Mgmt. v. Lane Capital Mgmt.*, 15 F. Supp. 2d 389, 398 (S.D.N.Y. 1998), *aff'd*, 192 F.3d 337 (2d Cir. 1999). Indeed, in such a case, "'the likelihood of confusion is inevitable.'" *Dunkin' Donuts Inc. v. N. Queens Bakery, Inc.*,216 F. Supp. 2d 31, 44 (2d Cir. 2001) (quoting *Opticians*, 920 F.2d at 195). "Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. *Such cases are 'open and shut'* and do not involve protracted litigation to determine liability for trademark infringement." *Opticians*, 920 F.2d at 195 (quoting 2 *McCarthy on Trademarks and Unfair Competition* § 23:3 (2d ed. 1984)) (emphasis added). *See also Southland Corp. v. Froelich*, 41 F. Supp.2d 227, 243 (E.D.N.Y. 1999) ("[W]here the unauthorized user of the trademark continues to use the identical,

previously licensed trademark, after revocation of the license, likelihood of confusion is established."). Simply put, as a leading treatise on trademark law has explained, Defendants' status as "holdover" franchisees is *dispositive* of the infringement issue:

> Once a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark. After the license has ended, the ex-licensee must stop use of the mark. Continued use by an ex-licensee of the licensor's mark constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor. As the Eleventh Circuit observed: "Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks." . . . Understandably, many ex-franchisees and ex-licensees are reluctant to give up use of the mark. Nevertheless, they clearly can be enjoined from any such further use.

4 *McCarthy on Trademarks and Unfair Competition* § 25.31 (4th ed. 1999) (footnote omitted) (quoting *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983)). *See also Burger King v. Majeed*, 805 F. Supp. 994, 1002-03 (S.D. Fla. 1992) (noting "well-settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes unfair competition").

Because Defendants' Franchise Agreements are terminated, Defendants are operating as holdover franchisees *per se*. Since Defendants' status is dispositive of the issue of infringement, there is no need to conduct the Seventh Circuit's seven factor test for determining likelihood of confusion. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043-1044 (7th Cir. 2000) (citations omitted) (setting forth the seven factor test). However, were such an analysis necessary, it would only confirm that a likelihood of confusion exists under the facts presented: (1) similarity of the marks – the marks in question are the same because Defendants continue to use Plaintiffs' marks; (2) similarity of products – the products are identical because Defendants continue to operate their shop as if they were *bona fide* franchisees of Plaintiffs; (3) area and manner of concurrent use – Plaintiffs already offer their products through identical retail outlets to the same customers; (4) degree of care likely to be exercised by consumers – Plaintiffs' products are frequently purchased on impulse and thus not subject to a high degree of scrutiny; (5) strength of mark – Plaintiffs' marks are registered, incontestable under 15 U.S.C. § 1065, and entitled to a statutory presumption of validity; (6) actual confusion – Defendants' unauthorized use of the Plaintiffs' marks can have no result other than to cause actual confusion because customers cannot possibly know that Defendants are not licensed Dunkin', Baskin, or Togo's

franchisees; and (7) Defendants' intent – Defendants clearly intend to pass off their Shops as authorized Dunkin', Baskin, and Togo's shops despite their clear knowledge that their Franchise Agreements and trademark licenses have been terminated. *See Majeed*, 805 F. Supp. at 1002-03 and *Burger King v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) (conducting similar analysis for holdover franchisees). Here, Defendants are continuing to use the exact same marks as when they were licensed franchisees. Accordingly, confusion is not only likely, it is inevitable, and the Court should find that Dunkin' is likely to succeed on the merits at trial.

C. **Plaintiffs Are Also Very Likely to Succeed on Their Unfair Competition and Trade Dress Infringement Claims (Counts IV and V).**

In Counts IV and V of the Complaint, Plaintiffs allege unfair competition and trade dress infringement, respectively. In order to succeed on a claim for unfair competition, Plaintiffs must show "two essential elements: (1) an association of origin by the consumer between the mark and the first user, and (2) a likelihood of consumer confusion when the mark is applied to the second user's good." *Forschner Group v. Arrow Trading Co.*, 904 F. Supp. 1409, 1417 (S.D.N.Y. 1995), *aff'd*, 124 F.3d 402 (2d Cir. 1997). Those elements are easily met in this case. It is beyond dispute that consumers associate the distinctive Dunkin', Baskin, and Togo's trademarks with Plaintiffs. And, as explained above, likelihood of confusion is established where an "unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license." *Froelich*, 41 F. Supp. 2d at 243; *N. Queens*, 216 F. Supp. 2d at 44 ("Here, defendants are using the exact same mark as they used when they were properly franchised, which will generate confusion among Dunkin' Donuts' customers as to the source of defendants' goods and services.").

Similarly, to succeed on a trade dress infringement claim, a plaintiff must show "that its mark is protected under the Lanham Act and that the challenged mark is likely to cause confusion among consumers." *See 551 Ogden, Inc.*, 235 F.3d at 1043, *citing Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 2000 WL 1735075, at *6 (7th Cir. 2000) (citations omitted). Plaintiffs have established that their marks are protected under the Lanham Act and that Defendants' use of their marks is likely to cause confusion.

Accordingly, Plaintiffs are likely to succeed on their unfair competition and trade dress infringement claims.

II.   **DEFENDANTS' CONTINUED USE OF PLAINTIFFS' PROPRIETARY MARKS AND METHODS HAS CAUSED AND CONTINUES TO CAUSE IRREPARABLE HARM, FOR WHICH THERE IS NO ADEQUATE REMEDY AT LAW.**

The Seventh Circuit recognizes that the "damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law." *Processed Plastic Co. v. Warner Commc'ns., Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). *See also Helene Curtis v. Nat'l Wholesale Liquidators,* Inc., 890 F. Supp. 152, 160 (E.D.N.Y. 1995) (Where "a plaintiff in a trademark infringement case has demonstrated a likelihood of success on the merits 'irreparable injury . . . almost inevitably follows' and, indeed, is *presumed*") (quoting *Omega Importing Corp. v. Petri-Kine Camera, Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971)) (emphasis added). Here, Defendants' unlicensed use of the marks has irreparably harmed, and will continue to irreparably harm, Plaintiffs in such a way that there is no adequate remedy at law.

A franchisor, like any trademark owner, has the right to license others to use its trademarks only in the manner that it prescribes. The unauthorized or unlicensed use of those marks creates a situation where the franchisor no longer can control its reputation and goodwill. Courts have uniformly held that the lack of control amounts to irreparable injury warranting an injunction. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured under the holder's trademark." *El Greco Leather Prods., Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). *See also Re/Max North Central, Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) ("The most corrosive and irreparable harm attributable to trademark infringement is the inability to control the nature and quality of defendants' goods. Even if the infringer's products are of high quality, the plaintiffs can properly insist that its reputation should not be imperiled by the acts of another").

A franchisor lacks control over its trademarks when the franchisee continues to utilize the franchisor's trademarks after the franchise agreement is terminated – which is the precise situation here. In such circumstances, the courts have consistently recognized a franchisor's right to an injunction preventing the continued unauthorized use of its trademarks. For example, in *Jiffy Lube Int'l, Inc.,* the Third Circuit held:

> The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated. *Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act.*

11

968 F.2d at 375 (emphasis added). Likewise, a franchisor has the same right to enjoin the unauthorized use of its trademark after the expiration of the franchise agreement. *See Lums Rest. Corp. v. Bloomington Rest. Inv., Inc.*, 92 Ill. App. 3d 1143, 1146 (1981) ("injunctions are available to preclude continued use of a trademark beyond the expiration of the contracts"). Defendants' conduct in continuing to operate the shops at issue here after the expiration of the Franchise Agreement interferes with the ability of Dunkin' to control the quality of the goods and services that Defendants continue to provide under the Dunkin' marks.

The lack of control that Plaintiffs' have over their marks as a result of Defendants' conduct is demonstrated in other ways as well. Assuming that they are dealing with authorized franchisees, customers of the JPI Shops will believe they are purchasing authentic Dunkin', Baskin, and Togo's goods, when, in fact, they are not. "Where the party seeking a preliminary injunction in trademark case shows that it 'will lose control over the reputation of its trademark pending trial,' the requirement of irreparable injury is satisfied." *N. Queens*, 216 F. Supp. 2d at 40. *See also My Favorite Muffin, Too, Inc. v. Wu*, No. 00 C 7820, 2002 U.S. Dist. LEXIS 7743, at *8 (N.D. Ill. Apr. 30, 2002) ("[A] franchisor . . . retains a duty to ensure that its trademarked goods or services are consistent."). Here, Plaintiffs face damage to their reputation – and, consequently, loss of customers – as a result of Defendants' distribution of products held out to be those of Plaintiffs. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998). There is no realistic way to determine damages under these circumstances. *See N. Queens*, 216 F. Supp. 2d at 40 ("[D]amages to a business's goodwill as a result of unauthorized trademark usage are not readily quantifiable and, thus, constitute irreparable injury"). *See also Robertson*, 147 F.3d at 1310. Defendants are also diverting business in their trading area away from licensed franchisees.

In addition to the *presumption* of irreparable harm that flows from a franchisor's loss of control over its trademarks in connection with any holdover franchisee's refusal to cease using its former franchisor marks, there is additional evidence of *actual* irreparable harm being caused by Defendants' partial deidentification and gross misuse of the Dunkin' Donuts trademarks in particular at the JPI Shops. *See SOF* ¶¶ 16-17. Defendants' bastardization of the Dunkin' name and logos causes trademark dilution, customer confusion, and palpable damage to the public image, reputation, and goodwill associated with the Dunkin' Donuts brand, and constitutes conduct injurious and prejudicial to Dunkin's proprietary marks. *See Sonana Sys., Inc. v.*

12

*Ramada Fran. Sys., Inc.*, Bus. Fran. Guide (CCH) ¶ 12,254, Sonana Systems, Inc. (M.D. Fla. 2002) (granting preliminary injunction against franchisee that had partially deidentified hotel premises following termination of franchise agreement because "there is no question that Solana's continued used of Ramada's marks is likely to deceive and to cause confusion among the public. Consumers automatically would associate the trademark user with the registrant and assume that they were affiliated . . . . Any shortcomings of the franchise would be attributed to Ramada."). Accordingly, under the circumstances, more than ample justification exists for a finding of irreparable injury.

## III.   THE BALANCE OF HARMS WEIGHS DECISIVELY IN PLAINTIFFS' FAVOR.

Under Seventh Circuit case law, the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d at 313-14. Dunkin' has already established an extremely high likelihood of success on the merits of its nonpayment and Lanham Act claims. In addition, it is plain that the balance of hardships weighs decisively in Plaintiffs' favor.

The harm to Plaintiffs from Defendants' unlicensed use of its marks outweighs any harm that Defendants may suffer from the grant of the requested injunction. In contrast to the irreparable harm suffered by Plaintiffs, any harm to Defendants is completely self-inflicted and thus cannot be deemed irreparable as a matter of law. *See, e.g., Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (self-inflicted harm cannot be deemed "irreparable"). *See also, Jiffy Lube*, 968 F.2d at 379 (The terminated franchisee's "self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark."); *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978); *Majeed,* 805 F. Supp. 994, 1006 (S.D. Fla. 1992) ("Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined."); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998) ("Defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff."). After all, "[o]ne who adopts the mark of another for similar goods acts at his own peril," because he has no claim to the profits or advantages thereby derived. *American Home*, 589 F.2d at 197. Moreover, any costs to Defendants are insignificant when balanced against the irreparable injury to the goodwill that Plaintiffs have created through the expenditure of

hundreds of millions of dollars in advertising and promoting its marks for over four decades. *See Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49, 51 (D. Mass. 1990) (holding that expenditures on four years' worth of advertising and promotion outweighed harm to infringers).

Furthermore, the denial of an injunction will adversely affect Plaintiffs' other franchisees – those who play by the rules and abide by their own Franchise Agreements. Those franchisees have a significant interest in preventing unlicensed individuals from operating under Plaintiffs' marks. The passing off of inferior products and services under those marks adversely affects all franchisees, particularly those in the same market. In addition, Defendants' unlicensed operations will divert business in their trading area away from licensed franchisees, thereby causing them to lose sales to which they are entitled. Licensed franchisees have placed their trust in the franchisor to protect their substantial investment in the system. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981) ("If the injunction is denied, . . . [the franchisor's] licensing program will lose much of the confidence reposed in it by the licensees, who also made substantial investments based upon the exclusivity of their licenses."). *See also Frisch's Rests., Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir. 1982).

Thus, the balance of harms weighs decisively in favor of Plaintiffs.

## IV. THE PUBLIC INTEREST FAVORS GRANTING DUNKIN'S MOTION.

The public interest favors the grant of an injunction as well. As discussed above, central to a trademark infringement action is whether the public is likely to be confused as to the source of the products in question. *See Opticians,* 920 F.2d at 195 (citing 2 *McCarthy on Trademarks and Unfair Competition* § 30:21). Indeed, the Seventh Circuit has stated that the "public has an interest in knowing with whom they do business." *Re/Max North Central, Inc.,* 272 F.3d at 433. In *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986), the Second Circuit found that "the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion." In addition, the public has an interest in the enforcement of contracts and ensuring the payment of debts.

Thus, the Court should issue the requested preliminary injunction because it serves the public interest.

## CONCLUSION

In sum, Plaintiffs have more than satisfied the required elements for an injunction. Plaintiffs are likely to succeed on the merits and continue to be irreparably injured by Defendants' conduct in such a way that there is no adequate remedy at law, and the balance of harms and the public interest both weigh in favor of the preliminary injunction. Accordingly, Plaintiffs respectfully request that their Motion for a Preliminary Injunction be granted.

Respectfully submitted,


s/ Steven J. Yatvin

Robert L. Zisk
David E. Worthen
Tristan B.L. Siegel
GRAY, PLANT, MOOTY, MOOTY
  & BENNETT, P.A.
2600 Virginia Avenue, N.W.
Suite 1111
Washington, D.C. 20037
Telephone:   (202) 295-2200
Facsimile:   (202) 295-2250

W. Scott Porterfield
Steven J. Yatvin
BARACK FERRAZZANO KIRSCHBAUM
PERLMAN & NAGELBERG LLP
333 West Wacker Drive
Suite 2700
Chicago, Illinois 60606
(312) 984-3100

Attorneys for Plaintiffs
Dunkin' Donuts LLC,
Dunkin' Donuts USA LLC,
Baskin-Robbins USA LLC,
Baskin-Robbins LLC,
Togo's Eateries, Inc., and
Third Dunkin' Donuts Realty LLC

Dated:  May 16, 2006

GP:1948601 v1

15