TDA _____

PC 300728

# DUNKIN' DONUTS FRANCHISE AGREEMENT

This Agreement, dated __8.8__, 19__97__ is made by and between DUNKIN' DONUTS INCORPORATED, a Delaware corporation with a principal place of business in Randolph, Massachusetts (hereinafter "DUNKIN' DONUTS"), and the following individual(s) and/or entity (hereinafter collectively "FRANCHISEE"):

___JP INVESTMENTS, INC., an Illinois Corporation___

This Agreement includes the Contract Data Schedule, General Terms and Conditions ("__DDFA0895__") and Special Terms and Conditions designated in Item "J" of the Contract Data Schedule below, which are attached hereto as Schedule(s) "A".

## CONTRACT DATA SCHEDULE

A. **Location of the Dunkin' Donuts Shop:**

| 1609 West Grand Avenue | | Waukegan, | IL | 60085 |
|---|---|---|---|---|
| (No.) | (Street) | (City or Town) | (State) | (Zip Code) |

B. **Term:** Twenty ( 20 ) years from the first date the Shop re-opens to serve the general public, ~~or, in the case of an existing Shop, until~~ _____

C. **Initial Franchise Fee:** _____N/A_____ Dollars ($ )

D. **Grand Opening Fee:** _____N/A_____ Dollars ($ )

E. **Continuing Franchise Fee Rate:** Four & Nine Tenths Percent (4.9%) of Gross Sales

F. **Minimum Continuing Advertising Fee Rate:** Five Percent (5.0%) of Gross Sales

G. **Remodeling Date:** Prior to the date the shop re-opens, and again on the Tenth Anniversary of the Date the shop re-opens.

H. **Transfer Fee:** Except as described in Section 10, the greater of:

(i) Four Thousand Dollars ($4,000.00), increased by five percent (5%) compounded annually during the term of this Agreement, including any renewal period; or

(ii) Five percent (5%) of the Adjusted Sales Price of the Dunkin' Donuts Shop if the transfer takes place within three (3) years after the date of this Agreement (except, if a new Shop, the first date on which the Shop opens to serve the public); or three percent (3%) of the Adjusted Sales Price of the Dunkin' Donuts Shop if the transfer takes place more than three (3) years thereafter.

I. **Address for notice to FRANCHISEE** shall be to the Dunkin' Donuts Shop, unless an address is inserted below:

_____

J. **Schedule "A":** (check all that apply)

- [ ] Schedule A.1 - New Shop developed by FRANCHISEE
- [ ] Schedule A.2 - New Shop developed by DUNKIN' DONUTS
- [ ] - None
- [x] Schedule A.3 - Non-Producing, Satellite Shop
- [x] Schedule A. 9- ~~Special Terms and Conditions for~~ Illinois
- [ ] Schedule A. - _____

FRANCHISEE acknowledges having carefully read this Agreement in its entirety, including all Schedules checked off above and the Personal Guaranty, if applicable. This Agreement is not binding upon DUNKIN' DONUTS until executed and attested to by its authorized representatives and delivered to FRANCHISEE.

Dunkin' Donuts Incorporated is an EOE and AA Employer.
Franchisees are not employees of Dunkin' Donuts Incorporated.

## GUIDELINES FOR SIGNING A DUNKIN' DONUTS FRANCHISE AGREEMENT
(guidelines are printed on this form for the convenience of the parties and do not constitute a part of the franchise agreement)

1. The franchise agreement will be filled out and assembled by DUNKIN' DONUTS, and delivered to the prospective FRANCHISEE in triplicate, at least five (5) business days before it is to be signed. Do not sign the agreement for at least ten (10) business days after you received your Dunkin' Donuts Offering Circular. Do not sign the agreement with any of the Contract Data Schedule blank. If any data typed onto the Contract Data Schedule is missing or needs correction, contact the DUNKIN' DONUTS regional office.

2. If the prospective FRANCHISEE will operate the business as a sole proprietorship or general partnership, the proprietor or each partner, as the case may be, must sign the contract as an individual, and all signatures must be witnessed by a competent adult. Limited partnerships are not permitted.

3. If the prospective FRANCHISEE will operate the business as a corporation:

   a. The President must sign the agreement on behalf of the corporation.

   b. The Secretary must attest the President's signature. If one person holds both offices, a competent adult must witness the President's signature.

   c. ALL shareholders must personally guarantee the corporation's performance.

   d. Complete and submit a Certificate of Corporate Resolution and Incumbency.

4. If the prospective FRANCHISEE will operate the business as a limited liability company ("LLC"), where permitted:

   a. The member who signs the agreement must be authorized to bind the LLC.

   b. A competent adult must witness the member's signature on behalf of the LLC.

   c. All members must personally guarantee the performance of the LLC.

   d. Complete and submit a Certificate of Authority and Incumbency for the LLC.

5. No changes may be made to the agreement without the prior approval of DUNKIN' DONUTS' Legal Department.

6. If there is a Schedule A-1 attached to the agreement (for a new shop developed by FRANCHISEE), the FRANCHISEE must put an "X" in the appropriate box in paragraph A-1.6.0.

DDFA0895

## GENERAL TERMS AND CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT

### Introduction

DUNKIN' DONUTS, as the result of the expenditure of time, effort and money, has acquired experience and skill in the development, opening and operating of shops and distribution outlets involving the production, merchandising and sale of donuts and other products utilizing a specially designed building or facility with specially developed equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, distribution and delivery methods, specifications and propriety marks and information, all of which are referred to in this Agreement as the "Dunkin' Donuts System". In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, service marks and trade names, including "Dunkin' Donuts", which is registered as a trademark on the Principal Register of the United States Patent Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark "Dunkin' Donuts", and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of DUNKIN' DONUTS' high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Shop in conformity with the Dunkin' Donuts System and in accordance with DUNKIN' DONUTS' standards and specifications.

### Section 1. Grant Of The Franchise

1.0   DUNKIN' DONUTS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this Agreement, at one location only, described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Site", "Dunkin' Donuts Shop" or "Shop", as the context permits). In connection therewith, this franchise includes the right to use at the Shop only, the trademark "Dunkin' Donuts", along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts shops, and the right to use at the Shop only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in DUNKIN' DONUTS' manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

1.1   This franchise is specific to one location only. It grants no rights outside the Site, nor includes any territorial protection against competition. DUNKIN' DONUTS reserves the right to operate or permit others to operate Dunkin' Donuts shops or to otherwise use the Proprietary Marks and/or the Dunkin' Donuts System, in each case at locations which may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Shop.

1.2   The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule of this Agreement; provided however, the term shall expire without notice upon any earlier expiration or termination of a lease or the foreclosure of a mortgage, affecting FRANCHISEE's possession and occupancy of the Shop.

1.3   FRANCHISEE and all partners and shareholders of FRANCHISEE represent and warrant that each individual is a United States citizen or a lawful resident alien of the United States; that each corporation is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to DUNKIN' DONUTS in connection with FRANCHISEE's application for this Dunkin' Donuts franchise is true and accurate.

### Section 2. Initial Services Furnished by DUNKIN' DONUTS

2.0   DUNKIN' DONUTS agrees:

2.1   To make available to FRANCHISEE the specifications and/or requirements for the equipment to be utilized in the Dunkin' Donuts Shop;

2.2   To make available to FRANCHISEE and FRANCHISEE's designated representative, prior to the initial opening of the Dunkin' Donuts Shop, a training program with respect to the operation of the Dunkin' Donuts System, at the Dunkin' Donuts University Corporate Training Center ("DDU") located in Braintree, Massachusetts, USA, or at such other training facility as DUNKIN' DONUTS may, from time to time, designate;

2.3   To provide operating procedures to assist FRANCHISEE in complying with DUNKIN' DONUTS' standard methods of record keeping, controls, staffing and training requirements, and production methods, and in developing approved sources of supply;

2.4   To make available to FRANCHISEE assistance, based on the experience and judgment of DUNKIN' DONUTS, in the pre-opening, opening and initial operation of the Dunkin' Donuts Shop and in conforming to the requirements of the Dunkin' Donuts System; and

2.5     Prepare and coordinate a "Grand Opening" promotional advertising program (or such other advertising program as DUNKIN' DONUTS may specify) for the initial opening of the Dunkin' Donuts Shop.

## Section 3. Continuing Services Furnished by DUNKIN' DONUTS

3.0     DUNKIN' DONUTS agrees:

3.1     To maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations;

3.2     To provide to FRANCHISEE standards, specifications, procedures and techniques of the Dunkin' Donuts System, as the same may be modified by DUNKIN' DONUTS from time to time, in its sole and absolute discretion;

3.3     To continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all Dunkin' Donuts shops, thus protecting and enhancing the reputation of DUNKIN' DONUTS and the demand for the products of the Dunkin' Donuts System and, to that end, to make reasonable efforts to disseminate its standards and specifications to potential suppliers of FRANCHISEE upon the written request of FRANCHISEE;

3.4     To review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Shop; and

3.5     To administer The Dunkin' Donuts Franchise Owners Advertising and Sales Promotion Fund (the "Fund") and to direct the development of all advertising and promotional programs. That portion of FRANCHISEE's advertising contribution equal to one percent (1%) of the Gross Sales of the Shop will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. Contributions to the Fund in excess of the percentage of Gross Sales set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate. The content of all advertising, as well as the media in which the advertising is to be placed and the advertising area, shall be at the discretion of DUNKIN' DONUTS. DUNKIN' DONUTS undertakes no obligation to insure that any individual franchisee benefits directly or on a prorata basis from the placement, if any, of advertising in local markets. Upon request, DUNKIN' DONUTS will provide FRANCHISEE a statement of receipts and disbursements of the Fund, prepared by an independent certified public accountant, for each fiscal year of the Fund.

## Section 4. Payments

4.0     FRANCHISEE agrees to make the following payments:

4.1     **Initial Franchise Fee** - FRANCHISEE shall pay DUNKIN' DONUTS an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Territory Development Agreement, Five Thousand Dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance upon written approval by DUNKIN' DONUTS of FRANCHISEE's location for the Dunkin' Donuts Shop, provided however, if the location is developed by DUNKIN' DONUTS, the balance shall be due in full upon FRANCHISEE's execution of the Lease of Dunkin' Donuts Shop, or on the date FRANCHISEE or FRANCHISEE's designated representative enters DDU, whichever date is earlier.

4.1.1     If the Dunkin' Donuts Shop is not open to serve the general public within fifteen (15) months from the date of this Agreement, the Initial Franchise Fee shall be increased to the then-current Initial Franchise Fee, which shall be payable to DUNKIN' DONUTS upon demand, unless DUNKIN' DONUTS elects to terminate this Agreement.

4.1.2     At any time prior to the date the second payment required under the terms of paragraph 4.1 of this Agreement becomes due, FRANCHISEE may terminate this Agreement, by written notice to DUNKIN' DONUTS. In that event, DUNKIN' DONUTS will return the initial installment paid upon execution of this Agreement, less a charge of Three Thousand Dollars ($3,000.00) to compensate DUNKIN' DONUTS for assistance rendered to FRANCHISEE to the date of termination. Franchise fees are not otherwise refundable.

4.2     **Grand Opening Fee** - FRANCHISEE shall pay the Fund a Grand Opening Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, which shall be nonrefundable after the Dunkin' Donuts Shop commences operating, for a Grand Opening Promotional Advertising Program (or such other advertising program as DUNKIN' DONUTS may specify). Payment shall be made in full prior to attendance by FRANCHISEE or FRANCHISEE's designated representative at DDU or thirty (30) days prior to the scheduled opening of the Dunkin' Donuts Shop, whichever date is earlier.

4.3     **Continuing Franchise Fees** - FRANCHISEE shall pay to DUNKIN' DONUTS at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or such other address as DUNKIN' DONUTS shall from time to time give to FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Dunkin' Donuts Shop for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement. The term "Gross Sales" used in this Agreement includes all sales made by FRANCHISEE pursuant to this Agreement, but shall not include sale of cigarettes, sales taxes or similar taxes.

4.4 <u>Continuing Advertising Fees</u> - FRANCHISEE shall pay to the Fund at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 of this Agreement, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Dunkin' Donuts Shop (excluding wholesale sales to accounts approved in writing, in advance, by DUNKIN' DONUTS). In addition, FRANCHISEE shall participate in and make additional payments to the Fund with respect to all advertising, marketing and other Dunkin' Donuts programs which from time to time are supported by a majority of producing Dunkin' Donuts Shops in the market in which the Dunkin' Donuts Shop is located with respect to local programs, and in the continental United States, with respect to national programs. DUNKIN' DONUTS reserves the right in its sole and absolute discretion to designate or change the composition of shops included in the base for purposes of determining a majority. FRANCHISEE shall have complete discretion as to the prices FRANCHISEE charges for product sold in the Dunkin' Donuts Shop. Nothing herein shall be construed to require FRANCHISEE to establish prices in accordance with programs supported by the majority of shops.

4.5 DUNKIN' DONUTS shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of DUNKIN' DONUTS.

## Section 5. Covenants of FRANCHISEE

5.0 FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to develop and maintain high and uniform standards of quality, cleanliness, appearance, service, facilities, products and techniques to increase the demand for Dunkin' Donuts products and to protect and enhance the reputation and goodwill of DUNKIN' DONUTS. Accordingly, FRANCHISEE agrees to devote full time, energy and effort to the management and operation of the Dunkin' Donuts Shop and to use continuous best efforts to maximize sales of the Dunkin' Donuts Shop.

5.1 <u>Continuous Shop Operation</u> - FRANCHISEE shall keep the Dunkin' Donuts Shop open and in normal operation twenty-four (24) hours per day on all days except Christmas and Thanksgiving, unless prior written approval is obtained from DUNKIN' DONUTS or unless DUNKIN' DONUTS otherwise directs in writing. FRANCHISEE shall operate the Dunkin' Donuts Shop so as to maximize Gross Sales and maintain all standards of the Dunkin' Donuts System. In connection therewith, but without limitation, FRANCHISEE further agrees:

5.1.1 To use all materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product preparation and delivery prescribed by or which conform to DUNKIN' DONUTS' standards and specifications; and to carry out the business covered by this Agreement in accordance with the operational standards and specifications established by DUNKIN' DONUTS and set forth in DUNKIN' DONUTS' operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to DUNKIN' DONUTS' franchisees from time to time.

5.1.2 To refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product preparation, merchandising, and delivery which do not meet DUNKIN' DONUTS' standards and specifications.

5.1.3 To offer for sale at the Dunkin' Donuts Shop all products that are, from time to time, designated in writing as approved for sale at Dunkin' Donuts Shops by DUNKIN' DONUTS; and to refrain from offering for sale any product(s) that have not been so designated in writing as approved by DUNKIN' DONUTS.

5.1.4 To maintain at all times a sufficient supply of approved products.

5.1.5 To purchase all food products, supplies, equipment and materials required for the operation of the Dunkin' Donuts Shop from suppliers who demonstrate, to the reasonable satisfaction of DUNKIN' DONUTS, the ability to meet all of DUNKIN' DONUTS' standards and specifications for such items; who possess adequate capacity and facilities to supply FRANCHISEE's needs in the quantities, at the times and with the reliability requisite to an efficient operation and who have been approved, in writing, by DUNKIN' DONUTS. Prior to purchasing any items from any supplier not previously approved by DUNKIN' DONUTS, FRANCHISEE shall submit to DUNKIN' DONUTS a written request for approval of the supplier. DUNKIN' DONUTS may require that samples from the supplier be delivered to DUNKIN' DONUTS or to a designated independent testing laboratory for testing prior to approval and use. A charge not to exceed the actual cost of the test shall be made by DUNKIN' DONUTS and shall be paid by FRANCHISEE; provided, however, the cost of the first test requested by FRANCHISEE in any calendar year shall be borne by DUNKIN' DONUTS.

5.1.6 To maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Dunkin' Donuts Shop and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by DUNKIN' DONUTS. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Dunkin' Donuts Shop (including the parking lot and landscaped areas) without the prior written consent of DUNKIN' DONUTS.

5.1.7 To comply promptly with all applicable laws, rules, regulations, ordinances and orders of public authorities including, but not limited to, the Board of Fire Underwriters and other similar organizations and all governmental agencies, however designated, which address health, safety, sanitation, environmental or other issues affecting operations of the Dunkin' Donuts Shop. FRANCHISEE agrees to submit to DUNKIN' DONUTS promptly upon receipt thereof,

4

copies of customer complaints and notices and communications from public authorities and hereby authorizes any such public authority to provide copies of all such notices and communications directly to DUNKIN' DONUTS.

5.1.8 To manage the Dunkin' Donuts Shop at all times with at least two (2) individuals, one of whom must be FRANCHISEE or a partner or shareholder of FRANCHISEE, and both of whom must have successfully completed the Dunkin' Donuts training program at DDU. Both individuals must have literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to satisfactorily complete training at DDU and to communicate with employees, customers, and suppliers. In the event FRANCHISEE applies for and receives approval to develop or purchase an additional Dunkin' Donuts shop, DUNKIN' DONUTS requires that the additional shop be managed by at least one (1) DDU trained individual approved by DUNKIN' DONUTS. FRANCHISEE shall ensure that all employees are trained in accordance with DUNKIN' DONUTS' training procedures and that the manager and all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Dunkin' Donuts Shop. FRANCHISEE shall attend, and shall require those employed in the Dunkin' Donuts Shop to attend, such further training as DUNKIN' DONUTS shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Dunkin' Donuts Shop will be borne entirely by FRANCHISEE. FRANCHISEE will also bear the cost of all other training programs. DUNKIN' DONUTS will bear the cost of presenting the initial Dunkin' Donuts training program at DDU.

5.1.9 To ensure accurate reporting of Gross Sales to DUNKIN' DONUTS and to implement all procedures recommended by DUNKIN' DONUTS to minimize employee theft. FRANCHISEE further agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to DUNKIN' DONUTS based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales includes ringing all sales in the cash register at the time the product is delivered to the purchaser including, without limitation, retail, wholesale and bulk discount sales and sales for which payment may be deferred. FRANCHISEE must obtain DUNKIN' DONUTS' prior written approval of all wholesale accounts.

5.2 **Books, Records and Reports** - FRANCHISEE shall keep full, complete and accurate books and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed below or as from time to time further prescribed by DUNKIN' DONUTS. FRANCHISEE agrees:

5.2.1 To submit to DUNKIN' DONUTS, on or before Thursday of each week, on an approved form, a signed statement of Gross Sales for the seven (7) day period ending at the close of business on the preceding Saturday along with all monies required to be paid under paragraphs 4.3 and 4.4 of this Agreement.

5.2.2 To submit to DUNKIN' DONUTS, on or before the twentieth (20th) day of each month, on an approved form, a profit and loss statement of the Dunkin' Donuts Shop for the preceding calendar or fiscal month prepared in accordance with generally accepted accounting principles.

5.2.3 To submit to DUNKIN' DONUTS, within thirty (30) days after the close of each six (6) month period, commencing with the opening of the Dunkin' Donuts Shop, on an approved form, a profit and loss statement for the six (6) month period and a balance sheet (including a statement of retained earnings or partnership account) as of the end of the period. Annual financial statements must be certified by an independent certified public accountant or such other independent public accountant as may be acceptable to DUNKIN' DONUTS.

5.2.4 To submit to DUNKIN' DONUTS, at the times required, such other periodic forms, reports and information as may from time to time be prescribed by DUNKIN' DONUTS.

5.2.5 To preserve, in the English language and for the time periods set forth below, all accounting records and supporting documents relating to the FRANCHISEE's operation of the Dunkin' Donuts Shop under this Agreement, and any lease with DUNKIN' DONUTS or its subsidiary (hereinafter called the "Records"), including but not limited to:

       a. daily cash reports;
       b. cash receipts journal and general ledger;
       c. cash disbursements journal and weekly payroll register;
       d. monthly bank statements, and daily deposit slips and canceled checks;
       e. all tax returns;
       f. suppliers invoices (paid and unpaid);
       g. dated cash register tapes (detailed and summary);
       h. semi-annual balance sheets and monthly profit and loss statements;
       i. daily production, throwaway and finishing records and weekly inventories;
       j. records of promotion and coupon redemptions;
       k. records of all wholesale accounts (DUNKIN' DONUTS' prior written approval of wholesale accounts is required); and
       l. such other records as DUNKIN' DONUTS may from time to time request.

During the term of this Agreement, FRANCHISEE shall preserve the Records for at least its current fiscal year and for the three (3) immediate past fiscal years. For three (3) years after the date of any transfer of an interest in this Agreement, the transferor of such interest shall preserve the Records for its last three (3) fiscal years of operation under this Agreement. For three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve the Records for its last three (3) fiscal years of operation under this Agreement.

5.2.6 To record all sales on cash registers, the make, model and serial numbers of which have been individually approved in writing by DUNKIN' DONUTS. Such cash registers shall contain a device that will record accumulated sales and cannot be turned back or reset, and a back-up power system for memory storage in the event of power loss.

5.3 **Insurance** - FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and DUNKIN' DONUTS, and their directors and employees, against any loss, liability or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with the Dunkin' Donuts Shop or by reason of FRANCHISEE's operation or occupancy of the Dunkin' Donuts Shop. Such policy or policies shall include comprehensive general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a single limit of One Million Dollars ($1,000,000.00) (or such higher limit as DUNKIN' DONUTS, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any lease for the Dunkin' Donuts Shop) for bodily injury and property damage combined, "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Dunkin' Donuts Shop and the contents thereof, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the Dunkin' Donuts Shop is located. All insurance afforded by the policies required under the terms of this Agreement shall:

5.3.1 Be written in the names of FRANCHISEE, DUNKIN' DONUTS, and any other parties designated by DUNKIN' DONUTS, as their respective interest may appear, by insurance companies acceptable to DUNKIN' DONUTS;

5.3.2 Contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;

5.3.3 Provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and

5.3.4 Not be limited in any way by reason of any insurance which may be maintained by DUNKIN' DONUTS or any party named.

During the term of this Agreement, FRANCHISEE shall promptly (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish DUNKIN' DONUTS with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that the premiums therefore have been paid. If at any time FRANCHISEE fails to comply with the provisions of this paragraph 5.3, DUNKIN' DONUTS, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Dunkin' Donuts Shop, at FRANCHISEE's sole expense. FRANCHISEE shall pay DUNKIN' DONUTS when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this paragraph 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in this Agreement.

5.4 **Advertising Approval** - FRANCHISEE shall submit all advertising and promotional materials prepared for use in local areas to DUNKIN' DONUTS prior to use. In the event written disapproval of the advertising and promotional material is not received by FRANCHISEE from DUNKIN' DONUTS within fifteen (15) days from the date such material is received by DUNKIN' DONUTS, said materials shall be deemed approved unless and until subsequently disapproved.

5.5 **Remodel of the Dunkin' Donuts Shop** - No later than the Remodeling Date set forth in Item "G" of the Contract Data Schedule of this Agreement, FRANCHISEE shall renovate and remodel the interior and exterior of the Dunkin' Donuts Shop to the then-current design for shops of comparable age and condition (including but not limited to fixtures, furnishings, signs and equipment). The nature and scope of renovation and remodeling shall be as then generally required by DUNKIN' DONUTS for shops of comparable age and condition.

5.6 **Cross-Guarantee** - In the event FRANCHISEE, or any partner or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other Dunkin' Donuts shop, FRANCHISEE agrees to be jointly and severally liable to DUNKIN' DONUTS as guarantor of the obligations of the franchisee under each franchise agreement for such other shop(s). Included in such guaranty is, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental payments and tax payments to subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to DUNKIN' DONUTS or guaranteed by DUNKIN' DONUTS to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any lease obligations by any shareholder(s) or partner(s), after such guaranty shall have expired or terminated by its terms.

5.7 **FRANCHISEE Entity** - FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein. If FRANCHISEE is a corporation, said corporation and its shareholders shall comply with the following requirements:

5.7.1 Such corporation's charter shall provide that its activities are limited exclusively to operating Dunkin' Donuts Shops as provided under this Agreement, unless otherwise permitted in writing by DUNKIN' DONUTS;

5.7.2 ●areholders of the corporation shall enter into a writt● ●eement, in a form satisfactory to DUNKIN' DONUTS, to jointly and severally guaranty the full payment and performance of the corporation's obligations to DUNKIN' DONUTS and to assume all personal obligations required of partners and/or shareholders contained in this Agreement;

5.7.3 Each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon transfers by this Agreement; and

5.7.4 No new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association or corporation without obtaining DUNKIN' DONUTS' prior written consent, pursuant to Section 10 of this Agreement.

## Section 6. Certain Rights of DUNKIN' DONUTS

6.0 In order to preserve the validity and integrity of the Proprietary Marks and to assure that the standards and specifications of the Dunkin' Donuts System are properly employed in the operation of the Dunkin' Donuts Shop and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, DUNKIN' DONUTS, or its agents, shall have the right, at all times, to enter and inspect the Dunkin' Donuts Shop and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the standards and specifications of the Dunkin' Donuts System. DUNKIN' DONUTS may require FRANCHISEE to remove any item which does not conform to applicable standards and specifications. DUNKIN' DONUTS may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable standards and specifications.

6.1 If, within twenty-four (24) hours following written notice by DUNKIN' DONUTS requesting the correction of an unhealthy, unsanitary or unclean condition, or within thirty (30) days following written notice by DUNKIN' DONUTS requesting maintenance, repairs or alterations to the Dunkin' Donuts Shop, FRANCHISEE has not corrected the condition or completed the maintenance, repairs or alterations, as the case may be, DUNKIN' DONUTS may enter the Dunkin' Donuts Shop, without being guilty of, or liable for, trespass or tort, and may cause the repairs, alterations or painting to be completed, or the condition to be corrected, at the expense of FRANCHISEE and without prejudice to any other rights or remedies of DUNKIN' DONUTS.

6.2 DUNKIN' DONUTS' representatives shall have the right to examine FRANCHISEE's original books, records and supporting documents at reasonable times and to perform such inspections, tests and analyses as it deems appropriate to verify Gross Sales. If an examination reveals that the Gross Sales reported by FRANCHISEE to DUNKIN' DONUTS are less than the Gross Sales ascertained by the examination, then FRANCHISEE shall immediately pay to DUNKIN' DONUTS any amounts owing to DUNKIN' DONUTS and the Fund and DUNKIN' DONUTS' rental subsidiary based upon the corrected Gross Sales. If an examination results from FRANCHISEE's failure to prepare, deliver or preserve statements or records required by paragraph 5.2 of this Agreement, or if an examination of FRANCHISEE'S records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay or reimburse DUNKIN' DONUTS for any and all expenses connected with the examination, including, but not limited to, reasonable accounting and legal fees, the unpaid amounts owed to DUNKIN' DONUTS, its rental subsidiary and the Fund, and interest thereon from the date payment was due at 18% per annum or the highest permissible rate. Such payments will be without prejudice to any other remedies DUNKIN' DONUTS may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3 Upon the request of DUNKIN' DONUTS in connection with the examination of FRANCHISEE's books and records under this Agreement, FRANCHISEE and all partners and shareholders of FRANCHISEE shall provide DUNKIN' DONUTS' representatives with personal federal and state tax returns, bank statements (including deposit slips and cancelled checks) and such other documents and information as DUNKIN' DONUTS may in its sole discretion request in connection with DUNKIN' DONUTS' efforts to verify Gross Sales reported to DUNKIN' DONUTS under this Agreement or any Lease of Dunkin' Donuts Shop. Personal tax returns and financial data unrelated to the franchise business need not be provided by any partner or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the franchised business, alone or in conjunction with any other family member or related entity.

6.4 FRANCHISEE hereby grants DUNKIN' DONUTS the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release to DUNKIN' DONUTS records of FRANCHISEE's purchases and deliveries, by electronic transfer or otherwise, at such times and places as DUNKIN' DONUTS shall request.

## Section 7. Proprietary Marks

7.0 FRANCHISEE acknowledges and agrees that "DUNKIN' DONUTS" is a registered trademark; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned by DUNKIN' DONUTS or which may be acquired in the future,

constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Proprietary Marks; and that any and all goodwill associated with the Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.1 FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE further agrees that any unauthorized use or continued use of the Proprietary Marks after the termination of this Agreement shall constitute irreparable harm subject to injunctive relief.

7.1.1 FRANCHISEE understands that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that DUNKIN' DONUTS, in its sole discretion, has the right to operate or franchise other Dunkin' Donuts Shops and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, in each case at such locations and on such terms and conditions as DUNKIN' DONUTS deems acceptable.

7.2.1 FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use "DUNKIN' DONUTS" or any other of the PROPRIETARY MARKS or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.2 FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks.

7.3 FRANCHISEE agrees to notify DUNKIN' DONUTS promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event DUNKIN' DONUTS undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for DUNKIN' DONUTS, be necessary to carry out such defense or prosecution.

7.4 FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Shop under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any proprietary marks used by DUNKIN' DONUTS, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of DUNKIN' DONUTS, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0 During the term of this Agreement or any extension thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, shall:

8.0.1 Divert or attempt to divert any business or customer of the Dunkin' Donuts Shop to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with DUNKIN' DONUTS' Proprietary Marks and the Dunkin' Donuts System;

8.0.2 Employ or seek to employ any person who is at that time employed by DUNKIN' DONUTS or by any other Dunkin' Donuts franchisee, or otherwise directly or indirectly induce such person to leave such employment;

8.0.3 Except with respect to the ownership or operation of additional licensed Dunkin' Donuts shops, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type offered by Dunkin' Donuts shops; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other Dunkin' Donuts shop. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with the rules of the American Arbitration Association then applicable for commercial disputes. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute;

8.0.4 Communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating a Dunkin' Donuts shop and all other information or knowledge which DUNKIN' DONUTS deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the licensed business. ,Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which DUNKIN' DONUTS designates confidential shall be deemed confidential for purposes of this Agreement. DUNKIN' DONUTS shall have the non-exclusive right to use and incorporate into the Dunkin' Donuts System, for the benefit of itself and other Dunkin' Donuts franchisees, any modifications, changes, and improvements developed or discovered by

FRANCHISEE or FRANCHISEE's employees or agents in connection the licensed business, without any liability or obligation to the developer thereof; or

8.0.5 Directly or indirectly contest or aid in contesting the right of DUNKIN' DONUTS or any prospective Dunkin' Donuts franchisee to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a Dunkin' Donuts Shop.

8.1 The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a decision to which DUNKIN' DONUTS is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.2 FRANCHISEE understands and acknowledges that DUNKIN' DONUTS shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

8.3 FRANCHISEE agrees that the existence of any claims against DUNKIN' DONUTS, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by DUNKIN' DONUTS of any of the covenants contained in this Section 8.

8.4 FRANCHISEE acknowledges that FRANCHISEE's violation of the terms of this Section 8 would result in irreparable injury to DUNKIN' DONUTS for which no adequate remedy at law may be available, and FRANCHISEE accordingly consents to the issuance of an injunction prohibiting any conduct by FRANCHISEE in violation of the terms of this Section 8.

## Section 9. Default

9.0 FRANCHISEE shall be in default under this Agreement:

9.0.1 If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2 If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any lease, mortgage, equipment agreement, promissory note, conditional sales contract or other contract materially affecting the Dunkin' Donuts Shop, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not DUNKIN' DONUTS is a party thereto.

9.1 **Thirty Day Cure Period** - Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from DUNKIN' DONUTS is received or refused, as the case may be. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1 **Seven Day Cure Period** - A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to DUNKIN' DONUTS any monies owing to DUNKIN' DONUTS or to the Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in paragraph 5.3 of this Agreement.

9.1.2 **24 Hour Cure Period** - A twenty-four (24) hour cure period shall apply to the violation of any law, regulation, order or DUNKIN' DONUTS standard relating to health, sanitation or safety; or if the FRANCHISEE ceases to operate the Dunkin' Donuts Shop for a period of forty-eight (48) hours without the prior written consent of DUNKIN' DONUTS, provided, however, that if the Shop is abandoned, no cure period shall apply.

9.1.3 **No Cure Period** - No cure period shall be available if FRANCHISEE is in default under paragraph 9.0.1 above; or if FRANCHISEE abandons the Dunkin' Donuts Shop; or if FRANCHISEE intentionally under-reports Gross Sales, falsifies financial data or otherwise commits an act of fraud with respect to its rights or obligations under this Agreement; or if FRANCHISEE's lease for the Dunkin' Donuts Shop with DUNKIN' DONUTS or a subsidiary of DUNKIN' DONUTS is terminated for reason of default by FRANCHISEE.

9.2 **Statutory Cure Period** - If a statute in the state in which the Dunkin' Donuts Shop is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3 **Interest and Costs** - If FRANCHISEE fails to remit when due any payments required under this Agreement, FRANCHISEE agrees to pay, in addition to the unpaid amounts, all collection costs, reasonable attorney's fees and

interest on the unpaid amounts at eighteen percent (18%) per annum or the highest permissible rate. If FRANCHISEE fails to cure a default, following notice, within the applicable time period set forth in paragraph 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including, without limitation, interest at eighteen percent (18%) per annum, or the highest permissible rate, and reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default or termination; and said interest and all damages, costs and expenses, including reasonable attorneys' fees, may be included in and form part of the judgment awarded to DUNKIN' DONUTS in any proceedings brought by DUNKIN' DONUTS against FRANCHISEE.

9.4     **Termination** - If FRANCHISEE fails to cure any default to DUNKIN' DONUTS' satisfaction, within the applicable period following notice from DUNKIN' DONUTS, DUNKIN' DONUTS may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from DUNKIN' DONUTS. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraph 9.0.1 or 9.1.3, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement:

9.4.1   FRANCHISEE shall promptly pay DUNKIN' DONUTS all sums owing or accrued from FRANCHISEE to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary prior to such termination or expiration, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by DUNKIN' DONUTS by reason of default on the part of FRANCHISEE, as set forth in paragraph 9.3 above;

9.4.2   FRANCHISEE shall immediately cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the Dunkin' Donuts System, any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices forming part of the Dunkin' Donuts System or otherwise used in connection with the operation of the Dunkin' Donuts Shop. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of DUNKIN' DONUTS' trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE. Nothing in this Agreement shall preclude DUNKIN' DONUTS from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, treble damages and injunctive relief;

9.4.3   FRANCHISEE shall immediately return to DUNKIN' DONUTS all operating manuals, plans, specifications, and other materials containing information prepared by DUNKIN' DONUTS and relative to the operation of a Dunkin'' Donuts Shop; and

9.4.4   FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the period specified therein.

9.5     No right or remedy herein conferred upon or reserved to DUNKIN' DONUTS is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.

## Section 10. Transfer Provisions

10.0    **Transfer By DUNKIN' DONUTS** - This Agreement shall inure to the benefit of the successors and assigns of DUNKIN' DONUTS. DUNKIN' DONUTS shall have the right to assign its rights under this agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by DUNKIN' DONUTS herein and FRANCHISEE receives a statement from both Dunkin' Donuts and its transferee to that effect. Upon such assignment and assumption, DUNKIN' DONUTS shall be under no further obligation hereunder except for accrued liabilities, if any.

10.1    **Transfer By FRANCHISEE** - Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any shareholder, if FRANCHISEE is a corporation, without DUNKIN' DONUTS' prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of DUNKIN' DONUTS shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of DUNKIN' DONUTS including, but not limited to, those set forth in this Section 10.

10.2    **Consent By DUNKIN' DONUTS** - DUNKIN' DONUTS shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1  FRANCHISEE must have operated the Dunkin' Donuts Shop for a period of not less than six (6) months prior to the proposed transfer;

10.2.2  The sales price of the interest to be conveyed must not be so high, in the good faith judgment of DUNKIN' DONUTS, as to jeopardize the ability of the transferee to maintain, operate and promote the Dunkin' Donuts Shop properly and meet the transferee's financial obligations to DUNKIN' DONUTS, third party suppliers and creditors. This provision shall not create any liability on the part of DUNKIN' DONUTS to the transferee in the event that DUNKIN' DONUTS approves the transfer and the transferee experiences financial difficulties;

10.2.3 ⬤ansferee and each partner and shareholder of transferⓔⓔ be a United States citizen or lawful resident alien of the United States and shall be of good moral character and reputation and shall have a good credit rating and business qualifications reasonably acceptable to DUNKIN' DONUTS. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in the good faith opinion of DUNKIN' DONUTS, to communicate with employees, customers, and suppliers of DUNKIN' DONUTS and to satisfactorily complete training at DDU. FRANCHISEE shall provide DUNKIN' DONUTS with such information as DUNKIN' DONUTS may require to make such determination concerning each proposed transferee; and/or

10.2.4 The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3 **Transfer Requirements** - Each transfer of any interest in FRANCHISEE, the Dunkin' Donuts Shop, this Agreement and/or the Dunkin' Donut franchise herein granted, must receive the prior written consent of DUNKIN' DONUTS set forth in paragraph 10.2 above and must conform to the following requirements:

10.3.1 Prior to the transfer, FRANCHISEE must satisfy all accrued money obligations to DUNKIN' DONUTS, its subsidiaries and the Fund, obligations of FRANCHISEE which DUNKIN' DONUTS has guaranteed, liens, deferred rent and other obligations under the Lease of Dunkin' Donuts Shop or other contracts pertaining to the Shop;

10.3.2 Prior to the transfer, the Dunkin' Donuts Shop, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with DUNKIN' DONUTS' then-current standards, including, without limitation, standards for replacements and additions;

10.3.3 FRANCHISEE and any transferee may not assert any security interest, lien, claim or right now or hereafter in this franchise, the franchise granted to the transferee, or, if applicable, the lease with DUNKIN' DONUTS' subsidiary for the Dunkin' Donuts Shop. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by DUNKIN' DONUTS, its successors or assigns;

10.3.4 Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of DUNKIN' DONUTS;

10.3.5 If the transferee is a corporation, it must comply with the terms of paragraph 5.7 of this Agreement;

10.3.6 The transferee, including, where appropriate, all shareholders and partners of the transferee, shall jointly and severally execute, on DUNKIN' DONUTS' then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable, with DUNKIN' DONUTS. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Shop and to DUNKIN' DONUTS, its subsidiaries and the Fund, payments to DUNKIN' DONUTS, its subsidiaries and the Fund will have priority. The transferee's franchise agreement shall require no greater percentages of Gross Sales than those required by paragraphs 4.3 and 4.4 of this Agreement. Unless a longer period is agreed upon between DUNKIN' DONUTS and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement and the transferee shall pay no initial franchise fee as provided in paragraph 4.1 of this Agreement (unless a longer term is agreed upon by DUNKIN' DONUTS);

10.3.7 The transferor, including all individuals proposing to transfer an interest in the franchise or the FRANCHISEE, must execute a general release of all claims against DUNKIN' DONUTS and its affiliated corporations and the directors, officers and employees of each; and

10.3.8 Prior to the transfer, FRANCHISEE must have fully paid and satisfied all of FRANCHISEE's obligations to DUNKIN' DONUTS, the Fund, and DUNKIN' DONUTS' rental subsidiary, if any, and FRANCHISEE must have paid DUNKIN' DONUTS the transfer fee provided below, if appropriate.

10.3.9 In addition, DUNKIN' DONUTS shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4 **Transfer Fee** - The transferor shall pay to DUNKIN' DONUTS the Transfer Fee set forth in Item "H" of the Contract Data Schedule of this Agreement. The "Adjusted Sales Price" shall include, without limitation, cash, assumption of debt, equipment lease obligations, and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the Contract of Sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1 The Adjusted Sales Price shall be the sales price to be received by FRANCHISEE upon transfer of the Dunkin' Donuts Shop less the amount paid by FRANCHISEE for the Dunkin' Donuts Shop, when purchased as a previously operated shop from another franchisee or from DUNKIN' DONUTS. No adjustment shall be made for amounts paid in connection with the development of a new Dunkin' Donuts shop.

10.4.2 For purposes of determining the correct Transfer Fee, DUNKIN' DONUTS reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in the good faith opinion of DUNKIN' DONUTS,

the allocation of the parties is unreasonable in relation to the value of the business. If DUNKIN' DONUTS purchases the Dunkin' Donuts Shop from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to DUNKIN' DONUTS as if FRANCHISEE had sold the franchised business to a third party.

10.4.3 For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, DUNKIN' DONUTS will reduce the Transfer Fee set forth in Item "H" of the Contract Data Schedule of this Agreement to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor, provided, however, DUNKIN' DONUTS will waive the Transfer Fee entirely if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.4 DUNKIN' DONUTS will waive the percent of Adjusted Sales Price, but not the fixed Transfer Fee of $4,000.00, subject to increase, in connection with a transfer of the Dunkin' Donuts Shop to FRANCHISEE's spouse or one or more of FRANCHISEE's children provided that, in DUNKIN' DONUTS' good faith opinion, FRANCHISEE has been in full compliance with the terms of all agreements with DUNKIN' DONUTS and its rental subsidiary. The Franchise Agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5 **Release of Transferor** - Upon DUNKIN' DONUTS' approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4, through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6 **Transfer on Death** - In the event of the death of FRANCHISEE, or any partner or shareholder thereof, at any time during the term of this Agreement, the legal representative of FRANCHISEE, or the partner or shareholder, together with all surviving partners of shareholders, if any, shall, within three (3) months of such event, jointly apply, in writing to transfer the franchise or the interest of the deceased partner or shareholder in such franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by DUNKIN' DONUTS upon fulfillment of all of the conditions set forth in paragraph 10.3 of this Agreement. A Transfer Fee shall be due pursuant to paragraph 10.4 above, except that paragraph 10.4.3 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1 If the legal representative and all surviving partners or shareholders, if any, do not comply with the provisions of paragraph 10 or do not propose a transferee acceptable to DUNKIN' DONUTS under the standards set forth in this Agreement, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to DUNKIN' DONUTS. DUNKIN' DONUTS shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. DUNKIN' DONUTS shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.7 **Right of First Refusal** - If FRANCHISEE, or any shareholder or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's or partner's interest in the franchised business, FRANCHISEE or such shareholder or partner shall notify DUNKIN' DONUTS and provide it with a complete copy of such offer. DUNKIN' DONUTS shall have the right and option, exercisable within forty-five (45) days after its receipt of said copy, to purchase FRANCHISEE's franchise, or such shareholder's or partner's interest in the franchised business, on the same terms and conditions as offered by said party. DUNKIN' DONUTS' exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to DUNKIN' DONUTS under paragraph 10.4. Should DUNKIN' DONUTS not exercise this option and the terms of the unaccepted offer be altered, DUNKIN' DONUTS shall, in each such instance, be notified of the changed offer and shall again have forty-five (45) days to exercise its right to purchase on the altered terms. Should DUNKIN' DONUTS not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Miscellaneous Provisions.

11.0 **Relationship of the Parties** - This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of DUNKIN' DONUTS or its subsidiary for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of DUNKIN' DONUTS or its subsidiary or to create any obligation, express or implied, on behalf of DUNKIN' DONUTS or its subsidiary. The parties agree that this Agreement does not create a fiduciary relationship between DUNKIN' DONUTS or its subsidiary and FRANCHISEE.

11.1 Under no circumstances shall DUNKIN' DONUTS or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Dunkin' Donuts Shop shall be borne by FRANCHISEE.

12.0 **Waiver** - Any failure of DUNKIN' DONUTS to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by DUNKIN' DONUTS of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by DUNKIN' DONUTS of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by DUNKIN' DONUTS of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. Acceptance by DUNKIN' DONUTS of payments due to it hereunder from any person or entity other than FRANCHISEE shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

13.0 **Notices** - All notices hereunder by DUNKIN' DONUTS to FRANCHISEE shall, at DUNKIN' DONUTS' option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from time to time give notice of to DUNKIN' DONUTS. All notices hereunder by FRANCHISEE to DUNKIN' DONUTS shall be sent by certified mail to Dunkin' Donuts Incorporated, Post Office Box 317, Randolph, Massachusetts 02368, Attn: Senior Vice President and General Counsel or to such other address as DUNKIN' DONUTS may from time to time give notice to FRANCHISEE.

14.0 **Entire Agreement** - This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between DUNKIN' DONUTS and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing.

14.1 The prospect for success of the business venture undertaken by FRANCHISEE by virtue of this Agreement is speculative and depends to a material extent upon FRANCHISEE's capability as an independent franchisee, as well as other factors. DUNKIN' DONUTS makes no representations or warranties as to the potential success of the business venture undertaken by FRANCHISEE hereby. FRANCHISEE represents and warrants that it has entered into this Agreement after making independent investigations of DUNKIN' DONUTS' business, and not in reliance upon any representation by DUNKIN' DONUTS as to sales or profits which FRANCHISEE in particular might be expected to realize. FRANCHISEE further represents and warrants that DUNKIN' DONUTS and its representatives, employees or agents have made no representations to induce FRANCHISEE to acquire this franchise and execute this Agreement which are not expressly set forth herein or in the Disclosure Materials provided to FRANCHISEE prior to entering into this Agreement.

14.2 Captions, paragraph and subparagraph designations and section headings are included in this Agreement for convenience only, and in no way do they define, limit, construe or describe the scope or intent of the respective parts of this Agreement.

15.0 **Severability** - Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

16.0 **Applicable Law** - This Agreement shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts.

16.1 Nothing herein contained shall bar the right of either party to obtain injunctive relief against threatened conduct that will cause loss of damages, under the usual equity rules, including the applicable rules for obtaining preliminary injunctions.

030195                                                                                              PC# 300728, Waukegan, IL

## SPECIAL CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT

## SCHEDULE "A-3"

### ADDITIONAL PROVISIONS FOR A SATELLITE UNIT

**A-3.1.0  Source of Products** - Products sold at this Dunkin' Donuts Shop shall be produced in the Dunkin' Donuts shop owned by FRANCHISEE or, if applicable, the partners, members or shareholders of FRANCHISEE, located at 1990 Skokie Valley Road, Highland Park, IL 60035, PC# 306048, hereinafter called the "Producing Unit"), except as DUNKIN' DONUTS may otherwise authorize and direct in writing. FRANCHISEE may not service wholesale accounts or other retail outlets from this Dunkin' Donuts Shop.

**A-3.2.0  Participation in Dunkin' Donuts Programs** - This Dunkin' Donuts Shop shall not be included in the base of Dunkin' Donuts shops for the purpose of determining the number of shops required to trigger participation in marketing, advertising or other programs, unless DUNKIN' DONUTS, in its sole and absolute discretion, elects to include this Dunkin' Donuts Shop in such base. FRANCHISEE shall participate in and make additional payments to the Fund with respect to all advertising, marketing and other Dunkin' Donuts programs as from time to time are supported or required to be supported by the Producing Unit.

**A-3.3.0  Percentage Rent for the Producing Unit** - Except as hereinafter set forth, if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, leases the Producing Unit from DUNKIN' DONUTS or its subsidiary, retail sales made from this Dunkin' Donuts Shop shall not be included in determining percentage rent, if any, as defined in the Producing Unit's lease. Wholesale sales made from the Dunkin' Donuts Shop will be deemed to be sales of the Producing Unit and subject to percentage rent and other charges under the terms of the lease for the Producing Unit. In addition and notwithstanding the foregoing, FRANCHISEE shall pay to DUNKIN' DONUTS or its subsidiary any percentage rent and other charges which DUNKIN' DONUTS or its subsidiary may be required to pay under any underlying lease applicable to the Producing Unit, because of any sales from this Dunkin' Donuts Shop. FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, shall execute an amendment to the lease for the Producing Unit in a form satisfactory to DUNKIN' DONUTS or its subsidiary incorporating the foregoing provisions.

**A-3.4.0  Production and Transport of Product** - This Dunkin' Donuts Shop is a non-producing Dunkin' Donuts sales outlet. Accordingly, FRANCHISEE shall not, without the prior written consent of DUNKIN' DONUTS, manufacture or finish any product at the Dunkin' Donuts Shop, except as authorized or directed by DUNKIN' DONUTS. DUNKIN' DONUTS reserves the right, in its sole and absolute discretion, to require FRANCHISEE to manufacture, in whole or in part, and/or to finish at the Dunkin' Donuts Shop products now or hereafter designated as approved for sale at Dunkin' Donuts shops. Products not manufactured at this Dunkin' Donuts Shop shall be manufactured at the Producing Unit and at no other place unless prior written approval is granted by DUNKIN' DONUTS. FRANCHISEE shall transport products and supplies from the Producing Unit to this Dunkin' Donuts Shop on a schedule and in a manner acceptable to DUNKIN' DONUTS that ensures compliance with federal, state and local regulation as well as DUNKIN' DONUTS' quality, freshness and other standards and that an adequate supply of product is available for sale at all times the Shop is open for business.

**A-3.5.0  Product and Vehicle Liability Insurance** - FRANCHISEE shall also maintain a policy or policies of product liability, vehicle liability, and non-owned vehicle liability insurance coverages, in the amounts set forth in paragraph 5.3 of the Franchise Agreement.

**A-3.6.0  Certain Rights of DUNKIN' DONUTS on Termination** - In the event the Dunkin' Donuts Shop's location is leased or licensed from a third party, FRANCHISEE shall use its best efforts to secure its landlord's execution of a standard form Dunkin' Donuts Lease Option Agreement. If FRANCHISEE is unable to obtain its landlord's execution thereof, FRANCHISEE shall execute and use its best efforts to secure its landlord's consent (where required) to a collateral assignment of lease to DUNKIN' DONUTS. Such collateral assignment shall grant DUNKIN' DONUTS the option to assume the lease or license agreement in the event of FRANCHISEE'S default under this Franchise Agreement or under the lease or license.

A-3.6.1  If FRANCHISEE is unable to obtain execution of a Lease Option Agreement or collateral assignment of the lease, or if DUNKIN' DONUTS, in its sole and absolute discretion, waives the requirement for these agreements, the following provision shall apply. At the expiration or termination of this Franchise Agreement, FRANCHISEE shall assign to DUNKIN' DONUTS at its request any lease or license agreement for the location. FRANCHISEE shall comply with all requirements for notice or consent under such lease or license agreement and shall execute documents acceptable to DUNKIN' DONUTS, assigning such lease or license agreement to DUNKIN' DONUTS. DUNKIN' DONUTS' rental payments shall be limited to those set forth in the assigned lease, license agreement or other document.

A-3.6.2  If the real estate for this Dunkin' Donuts Shop is owned or controlled in whole or in part by FRANCHISEE or the partners or shareholders of FRANCHISEE, DUNKIN' DONUTS shall have the option, upon any early termination of this Franchise Agreement, to lease the location for the duration of the original term of the Franchise Agreement. DUNKIN' DONUTS' rental payments thereunder will be equivalent to then current market value and shall be determined by agreement between the owner of the real estate and DUNKIN' DONUTS or, if they fail to agree, by arbitration under the rules of the American Arbitration Association. The intent of the above is to preserve the site as a Dunkin' Donuts sales outlet, at DUNKIN' DONUTS' option, should the FRANCHISEE default under the Franchise Agreement or any contract affecting the operation of the Dunkin' Donuts Shop.

**A-3.7.0  Default** - FRANCHISEE shall be in default under this Franchise Agreement if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, fails to comply with all the requirements imposed by the Franchise Agreement for the Producing Unit. FRANCHISEE shall be in default under this Franchise Agreement if the Franchise Agreement for the Producing Unit is terminated.

A-3.7.1  **Cure Period** - A thirty day cure period shall apply if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, fails to comply with any of the requirements imposed by the Franchise Agreement for the Producing Unit. No cure period shall be available if the Franchise Agreement for the Producing Unit is terminated.

PC#300728, Waukegan, IL

090195

STATE OF ILLINOIS

SPECIAL TERMS AND CONDITIONS OF THE DUNKIN' DONUTS FRANCHISE AGREEMENT

SCHEDULE "A-9"

ADDENDUM TO SECTION 16.0: CHOICE OF LAW

Section 4 of the Illinois Franchise Disclosure Act of 1987 provides as follows:

Jurisdiction and Venue

Section 4. Any provision in a franchise agreement which designates jurisdiction or venue in a forum outside of this State is void with respect to any cause of action which otherwise is enforceable in this State, provided that a franchise agreement may provide for arbitration in a forum outside of this State.

The Illinois Attorney General's Office has taken the position that the foregoing provision applies to the choice of which state's law shall govern this Agreement. Accordingly, Section 16.0 of the Franchise Agreement is hereby amended by adding the following thereto:

"To the extent that Section 16.0 of this Agreement conflicts with or is unenforceable under Section 4 of the Illinois Franchise Disclosure Act of 1987, the provisions of said Section 4 shall apply."

DUNKIN' DONUTS INCORPORATED

By _____
David Nugent, Senior Market Executive

(FRANCHISEE)
JP INVESTMENTS, INC.

_____
James Pielet, President

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this Agreement in triplicate on the date and year first written above. FRANCHISEE acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.

| ATTEST: | DUNKIN' DONUTS INCORPORATED |
|---|---|
| _____[signature]_____ <br> Arthur J. Anastos, Asst. Secretary | By: _____David Nugent_____ <br> David Nugent, Senior Market Executive |

| ATTEST/WITNESS: | JP INVESTMENTS, INC. _____ FRANCHISEE |
|---|---|
| _____Violet A. Oswald_____ <br> ~~Secretary~~ | By: _____James Pielet_____ <br> James Pielet                President |
| | _____ FRANCHISEE |
| | _____ FRANCHISEE |
| | _____ FRANCHISEE |
| | _____ FRANCHISEE |

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION

We, the undersigned shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of ___JP INVESTMENTS, INC._____, a corporation organized under the laws of the state of ___Illinois___, waiving demand and notice, hereby, jointly and severally, personally guarantee the full payment of the corporation's money obligations under Section 4 and the performance of all of the corporation's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety, relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that DUNKIN' DONUTS may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of the corporation's money obligations under paragraph 4; (b) modify, with the consent of the corporation, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of DUNKIN' DONUTS against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

Signed in the presence of:

| _____Violet A. Oswald_____ Witness | _____James Pielet_____ James Pielet      Individually |
|---|---|
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |
| _____ Witness | _____ Individually |